**Billy COOK, et al.**

v.

**Pat G. LUCKETT, et al.**

**CANTON BRANCH, NAACP, et al.**

v.

**Don LANE, et al.**

**Civ. A. Nos. J83–0381(B), J83–0391(B).**

United States District Court,
S.D. Mississippi,
Jackson Division.

Oct. 12, 1983.

John W. Christopher, Stanley F. Stater, III, Christopher & Stater, Canton, Miss., for plaintiffs.

Hubbard T. Saunders, IV, Jackson, Miss., Joe R. Fancher, Jr., G. Milton Case, Canton, Miss., for defendants.

## ORDER AND MEMORANDUM OPINION

BARBOUR, District Judge.

This cause came before this court subsequent to the granting of the Plaintiffs' motion for a Preliminary Injunction for the purpose of determining a constitutional plan for redistricting the Board of Supervisors Districts of Madison County, Mississippi. At the evidentiary hearing on August 30, 1983, the parties and any interested third parties were invited to present plans to be considered for adoption by this Court or to assist this Court in the formulation of a plan in light of the failure of Defendant Board of Supervisor to exercise its responsibility in redistricting the county. (*See Memorandum Opinion* issued in this action setting forth the reasons for the granting of the injunction.)

There are two sets of plaintiffs involved in this litigation. The first suit was filed by two registered voters of the two underrepresented districts in Madison County, one being a white voter and the other a black voter, hereinafter called the "Cook Plaintiffs." The second suit was filed by the Canton Branch of the NAACP, hereinafter called the "NAACP Plaintiffs," on behalf of all black voters of Madison County. By previous order of this Court these actions were consolidated.

At the evidentiary hearing two plans were presented to the Court for consideration. The Board of Supervisors and the NAACP Plaintiffs presented one plan jointly, and the Cook Plaintiffs presented a plan drawn independently. Both plans represent efforts to comply with the one person-

one vote requirement of the Constitution and the requirements of the Voting Rights Act.

BACKGROUND

Madison County has been an area of explosive growth in the past few years and is expected to experience continued expansion as it is located on the northern boundary of Jackson, Mississippi, the state's largest city. The southern part of Madison County is the area most affected by this pattern of growth. In spite of this uneven growth the county has not been redistricted since at least 1890. When the present district lines were drawn, arbitrary section lines were used. These have no correspondence to visible features on the ground and are difficult to locate.

The population figures shown by the census for 1960, 1970 and 1980 show the drastic nature of the changes which have taken place. (*See* table of population trends by supervisor districts, Appendix No. 1.) The two districts which have seen the most growth are One and Three, District Three being located in the southeastern part of the county adjacent to Jackson and District One including the Canton area. (*See* map of Madison County showing the existing lines, Appendix No. 2.)

As the middle-class bedroom communities of Madison and Ridgeland have grown in the southeastern part of the county, the percentage of blacks has decreased. In 1960 the black population was 71.8% of the total county population. In 1980 the black population was only 55.9% of the total county population. Because the increased population is predominantly white the ratio of white to black has been dramatically changed. (*See* Appendix No. 1.) This has also contributed to the extreme population disparities between the districts. The district with the largest population, District One, with a population of 16,963 according to the 1980 census, had an overall increase in the black population from 68.3% in 1960 to 71.9% in 1980. The next largest district,

District Three with a population of 14,914 according to the 1980 census, had an overall increase in the white population from 30.6% in 1960 to 72.8% in 1980. The three smaller districts, Two, Four and Five, have total populations of 3,823, 3,744 and 2,169, respectively. The percentages of blacks in these districts are 56.1%, 81.5% and 83%, respectively. The total population variance between the districts is approximately 178%, far from acceptable limits.

THE PLANS

The Board-NAACP plan (see Appendix Nos. 4, 5 and 6) uses the existing lines where possible and re-arranges populations in an attempt to create five equally populated districts. The Cook Plaintiffs started from scratch and using a planner attempted to draw lines which would make the most sense from the standpoint of growth patterns. The expert for the Cook Plaintiffs was directed to draw a plan that would comply with the one-person, one-vote requirements, would not dilute black voting strength and would make sense from a professional planner's point of view. The Board-NAACP plan is a compromise plan which clearly contorts the districts in order to achieve political ends. (*See* Appendix No. 3.) The Board-NAACP plan purports to achieve equality in population and area as well as to avoid pitting incumbents against one another. Because Canton is the center of the county, both plans have most of the districts come into Canton, the county seat, in order to achieve equal populations among the districts.

Although the population figures of the two plans may not be directly compared by district because there is little resemblance between the configuration of the districts under the plans, from the demographic standpoint the two plans are similar in many respects. The two tables which follow show the alleged population of the districts under each plan broken down by race.

| DISTRICT | TOTAL POPULATION | VARIANCE | BLACK POPULATION | PERCENTAGE BLACK |
|----------|------------------|----------|------------------|------------------|
| | | BOARD–NAACP PLAN | | |
| 1 | 8327 | +0.1% | 5948 | 71.4% |
| 2 | 8323 | 0% | 4107 | 49.3% |
| 3 | 8325 | 0% | 1987 | 23.9% |
| 4 | 8321 | 0% | 5317 | 63.9% |
| 5 | 8317 | −0.1% | 5896 | 70.9% |
| TOTAL | 41,613 | 0% | 23,255 | 55.9% |

| DISTRICT | TOTAL POPULATION | VARIANCE | BLACK POPULATION | PERCENTAGE BLACK |
|----------|------------------|----------|------------------|------------------|
| | | COOK PLAINTIFFS PLAN | | |
| 1 | 8367 | +0.5% | 4570 | 54.3% |
| 2 | 8192 | −1.6% | 3178 | 39.0% |
| 3 | 8322 | 0% | 3370 | 40.5% |
| 4 | 8336 | +0.2% | 6405 | 76.8% |
| 5 | 8396 | +0.9% | 5735 | 68.3% |
| TOTAL | 41,613 | 2.5% | 23,255 | 55.9% |

Both plans provide for three black majority districts. Under both plans two of the black majority districts have black majorities in excess of 65%.

A dispute arose at the hearing concerning the population figures used by the expert presented by the Board and the NAACP Plaintiffs in the preparation and support of the Board-NAACP Plan. As indicated above, that plan purported to have a high variance from the norm of +0.1% and a low variance of −0.1% or a total variance of 0%. (This Court understands that the total variance would be 0.2% under such circumstances.) The expert presented by the Cook Plaintiffs testified extensively and in great detail, district by district, and demonstrated that the population figures used by the Board-NAACP expert were in error and that the Board-NAACP Plan had an actual variance from the population norm of 10.6%, being a total of a high variance of +5.7% in District Two and a low variance of −4.9% in District Three. This testimony was not rebutted in any fashion by the Board or by the NAACP Plaintiff except for a general denial. This Court accepts the testimony of the expert of the Cook Plaintiffs as being more persuasive on this point.

In addition to the total deviation for which there was no articulated reason, the districts drawn by the Board-NAACP are contorted and fail on their face to take communities of interest into account. Although the Board-NAACP districts are technically contiguous, their achievement is minimized by the contortions of the districts which they have drawn. (See Appendices No. 3, 4 and 5). There are several examples which serve to illustrate the nature of the Board-NAACP proposed districts: 1) District One which has been described as a "dumbbell" shape is almost divided in half by District Five where it funnels into Canton in order to pick up the required population for one-person, one-vote purposes. District One enters the city limits of Canton and winds through the city by way of a narrow path, often only a block or two wide, and then takes in a substantial area on the other side of Canton. 2) District Four stretches the entire length of the southeast side of the county

bulging at the southern most point although it too is connected with the other part of the District only by an extremely narrow strip. 3) District Two also stretches across a large area as does District Five with difficult access between different parts of the District. 4) The city of Canton is a maze of three districts which converge in helter skelter patterns on the city. Districts Five and Four come into the city from the north and the south while District One winds through the middle. The lines within the city often cut across fields and utilize other than visible boundaries. 5) The Madison-Ridgeland area is also carved into districts which often do not make sense, such as the dividing of communities of interest by the running of a district line through the middle of an apartment complex, dividing it between Districts Two and Four.

The Cook Plaintiffs plan as presented is a rational approach to dividing the county. It avoids splitting communities of interest and uses visible boundaries in almost all instances. The plan places all of the Ross Barnett Reservoir area in one district, all of the city of Madison in one district, the majority of the city of Ridgeland in one district, and uses major roads to divide the city of Canton between Districts One, Two, Four and Five. The shapes of the districts are regular and easily discerned. (*See* Appendix No. 6)

APPLICATION OF THE LAW

Clearly this is not the typical redistricting case. There has been no attempt to redistrict the county since at least 1890. There have been substantial population increases. There has been a dramatic change in the black-white ratio. The case has two sets of plaintiffs having both comparable and conflicting aims. The Attorney General of the United States has precleared the Board-NAACP plan.

CLASS CERTIFICATION

The initial question which must be addressed is that of class certification. Both plaintiffs moved to certify a class. The NAACP's proposed class is composed of all black citizens and registered voters of Madison County. The Cook Plaintiff's proposed class consists of all under-represented voters in Madison County, that is, those registered to vote in the current Districts One and Three. There is a substantial overlap between these two classes proposed to this Court. It is also clear from the configuration of the parties that there is more than a chance that neither of the competing representatives could fully and fairly represent all the members of the proposed classes because of the substantial conflict, not necessarily along racial lines, which separate not only the two sets of plaintiffs, but many of the people of Madison County on the issues of this case.

■ In this case, the relief which is sought will have the same effect as a class action whether the class is certified or not. Where "the very nature of the rights [sought to be vindicated] requires that the decree run to the benefit not only of the named plaintiffs but also for all persons similarly situated" *United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach, Florida,* 493 F.2d 799, 812 (5th Cir.1974), then it is unnecessary to determine whether a class action is proper. *See Bailey v. Patterson,* 323 F.2d 201, 206 *cert. denied,* 376 U.S. 910, 84 S.Ct. 666, 11 L.Ed.2d 609 (1963) (class action not necessary); *Cousins v. City Council of City of Chicago,* 466 F.2d 830, 845 (7th Cir.) *cert. denied.* 409 U.S. 893, 93 S.Ct. 85, 34 L.Ed.2d 181 (1972) (in municipal redistricting case court held that although reapportionment litigation affects interests of large class and such actions are usually brought as class actions, the class action device is not essential).

The proper concern for the court is that the parties have "such a 'personal stake in the outcome of the controversy' *Baker v. Carr,* 369 U.S. 186, 204 [82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962) ], as to insure that 'the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

*See also Gray v. International Brotherhood of Electrical Workers,* 72 R.F.D. 638, 640–42 (1977) (Where relief sought can be fashioned so there is no need for certification of class, it is unnecessary and inappropriate. Cases cited.)

 Accordingly, this Court finds that the certification of a class in this case is unnecessary and inappropriate.

### CONSTITUTIONALITY

 The next question which this Court must address is the constitutionality of the plans presented at the evidentiary hearing. Suit was brought on the basis of the one-person, one-vote requirement of the Equal Protection Clause of the Fourteenth Amendment. *Reynolds v. Sims,* 377 U.S. 533, 568, 84 S.Ct. 1362, 1385, 12 L.Ed.2d 506 (1964). Although strict mathematical equality may be impossible, the governmental unit must attempt to achieve population equality as nearly as practicable. *Karcher v. Daggett,* ____ U.S. ____, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983). The principle of equality in electoral apportionment applies to state and local elections, *Avery v. Midland County,* 390 U.S. 474, 481, 88 S.Ct. 1114, 1118, 20 L.Ed.2d 45 (1968). "[S]lightly greater percentage deviations may be tolerable for local government apportionment schemes ..." *Abate v. Mundt,* 403 U.S. 182, 185, 91 S.Ct. 1904, 1906, 29 L.Ed.2d 399 (1971), but deviations from population equality must be justified by legitimate state or local considerations, *Swann v. Adams,* 385 U.S. 440, 444, 87 S.Ct. 569, 572, 17 L.Ed.2d 501 (1967); *Abate v. Mundt,* 390 U.S. at 185, 91 S.Ct. at 1906.

 The opinion in *Reynolds* limited variations to situations that "... might be justified by such state policy considerations as the integrity of political subdivisions, the maintenance of compactness and contiguity in legislative districts or the recognition of natural or historical boundary lines." *Swann v. Adams,* 385 U.S. at 444, 87 S.Ct. at 572. Furthermore, such deviations must be free from the taint of arbitrariness or discrimination. *Roman v. Sincock,* 377 U.S. 695, 710, 84 S.Ct. 1449, 1458, 12 L.Ed.2d 620 (1964).

 The districts drawn by the Board-NAACP were an effort to achieve equality; however, they were drawn in irrational configurations and there was no testimony offered to justify their location. This Court finds that there is a total deviation of 10.6% from average district population and that neither the Board nor the NAACP offered any proof justifying this deviation. This Court further finds that the deviation is unconstitutional.

### OTHER CONSIDERATIONS

The evidence that the Board-NAACP Plan was drawn to equalize the road mileage in each district is unpersuasive in light of the contorted districts which were drawn and the character of the testimony at the trial. If this were a major goal of the plan submitted, then the Board-NAACP Plan fails to address it by making the districts unmanageable in length and contorting the areas encompassed by the district to make some areas unreasonably remote from the general geographic area of the district. The Cook Plaintiffs' Plan does much more to address this problem with its relatively compact districts which, even though varying substantially in area, reflect the density of population in the districts. Logically the districts with greater population density will have more traffic and will require greater maintenance. This Court finds that the issue of road mileage is better addressed by the Cook Plaintiffs' plan.

This Court finds that the Board-NAACP plan does not conform to the end of creating compact or contiguous districts in that the districts which were submitted are anything but compact and do not take communities of interest into consideration. The districts are contiguous only in the technical sense. Their contiguity is achieved through contortions of the districts and as such they are unacceptable.

The Board-NAACP used only a very few of the existing district lines. However, because the existing districts are so outdat-

ed they are a poor basis upon which to build the new districts. Madison County has waited for almost one hundred years for new districts; they need not be so poorly designed. Although the Board-NAACP paid lip service to the use of existing lines, this Court finds that this was not a bona fide goal of the plan.

There is no doubt but that legislative plans should be accorded considerable deference, *Upham v. Seamon*, 456 U.S. 37, 40–42, 102 S.Ct. 1518, 1520–21, 71 L.Ed.2d 725 (1982). However, there is considerable doubt that the plan offered jointly by the Board and the NAACP Plaintiffs is a legislative plan. This Court does not need to reach this question due to the finding that the plan offered fails to meet constitutional requirements of one-person, one-vote and also fails in many other factors involved in evaluating redistricting plans.

■ The fact that the Board-NAACP Plan has been pre-cleared by the Attorney General under § 5 is likewise unpersuasive in defense of that plan because the Attorney General did not have the information with regard to miscalculations and other factors critical of the Board-NAACP Plan which this Court has considered in the context of the adversary hearing.[1]

## COMPLIANCE WITH THE VOTING RIGHTS ACT

The 1982 amendments to the Voting Rights Act of 1965 require this Court to determine whether the plan was enacted with the purpose of discriminating or whether it has the effect of discriminating. There has been no direct evidence or argument by any party that either plan has the purpose or effect of discriminating against the black population of Madison County. The Court's own study and analysis of the census figures and of the maps leads to the conclusion that neither plan was prepared with discriminatory intent nor discrimi-

nates against the black voters in effect. The substantial decrease in the black population by necessity lowers the ratio of black voters to white voter.

Both of the plans presented give the black voters two "strong" black districts and one district which is approximately even. No evidence was developed at the hearing which would indicate that either plan impermissibly diluted black voting strength. Although the Supreme Court in *Beer v. United States*, 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976) held that the Voting Right Act prohibited changes that would "lead to retrogression in the position of racial minorities" *Beer*, 425 U.S. at 141, 96 S.Ct. at 1364, it did not address the situation which this Court faces in this case where the county has experienced a dramatic decrease in the black population percentage. In order to comply with the one-person, one-vote requirement there must be some reduction in the percentages of black voters in the districts.

### CONCLUSION

■ The plan presented by the Cook Plaintiffs is adopted and both the NAACP and the Cook Plaintiffs' motion for class certification is denied.

### ORDER

Based upon the above findings of fact and conclusions of law, this Court hereby orders the following:

1. The redistricting plan presented by the Cook Plaintiffs is hereby adopted by this Court as its plan for the redistricting of the Supervisors Districts of Madison County, Mississippi. A copy of the legal descriptions of these districts is attached hereto as Appendix No. 7 and is adopted by the Court. A map of said districts is attached hereto as Appendix No. 6.

2. Since the redistricting plan adopted hereby is substantially different from the

---

1. The preclearance of a reapportionment plan does not preclude private litigation attacking it. *United States v. East Baton Rouge Parish School Bd.*, 594 F.2d 56, 59 n. 9 (5th Cir.1977). Because of differing criteria preclearance often has no probative value in subsequent litigation. See *Morris v. Gressett*, 432 U.S. 491, 506–07, 97 S.Ct. 2411, 2421–22, 53 L.Ed.2d 506 (1977); *Major v. Treen*, 574 F.Supp. 325 (E.D.La.1983).

existing plan, there will of necessity have to be made changes in the voting precincts and possibly in at least some of the polling places. These changes have not been addressed by the parties. The Cook Plaintiffs are hereby ordered to file with this Court on or before October 21, 1983, a proposal setting forth voting precincts and polling places for the redistricting plan adopted herein.

A hearing is hereby set before this Court in the Fourth Floor Courtroom, U.S. District Court, Post Office Building, Jackson, Mississippi, at 9:00 A.M. on October 28, 1983, at which this Court will consider evidence for the adopting of voting precincts and polling places under the redistricting plan adopted hereby.

3. The Election Commission and the Circuit Clerk of Madison County shall forthwith commence the task of conforming the poll books by administrative transfer of the registered voters to the new districts adopted hereby and shall complete the revision as promptly as possible but in any event by December 26, 1983. This Court anticipates issuing an order establishing voting precincts and polling places shortly after the hearing set for October 28, 1983. After such order, the Election Commission and the Circuit Clerk will then be able to complete the administrative transfer of the registered voters to precincts as well as new districts.

When the administrative transfer has been completed, the Circuit Clerk shall notify each affected voter of his or her new supervisory district and/or voting precinct.

4. The Election Commission and the Circuit Clerk of Madison County shall prepare for, hold and conduct special elections for supervisors of Madison County in accordance with the plan adopted by this order and in accordance with the mandates hereof.

5. Special elections for supervisors hereunder shall comply as closely as possible with the special election statute of the State of Mississippi, Section 23–5–203, Mississippi Code of 1972, and other applicable statutes; however, the following specific

orders shall override anything in such statutes to the contrary:

a. Said elections shall be held on January 10, 1984, and in the event there is not a majority winner, a runoff election will be held on January 24, 1984.

b. Immediately upon entry of this Order each prospective candidate for supervisor may qualify for such election by filing with the Election Commissioners of Madison County a petition nominating such prospective candidate which contains signatures and addresses of not less than fifty (50) qualified electors who are residents of the supervisor district which the prospective candidate offers to represent. The Circuit Clerk shall examine each of said petitions and certify to the Election Commission whether each petition contains the requisite signatures of qualified voters. The deadline for filing any such petitions by prospective candidates shall be on or before 5:00 P.M. on December 26, 1983.

c. Upon receipt of such qualifying petition and the Circuit Clerk's certificate and upon determination by the commissioners of election that the offering candidate is qualified as required by Mississippi Code Annotated Section 19–3–3, each prospective candidate thus qualified shall be placed upon the ballot for the election for the appropriate supervisor position.

d. Each candidate receiving a majority of the votes cast for the office for which he offers in the January 10, 1984, election, or in the event no candidate receives a majority, then the winner of the runoff election held on January 24, 1984, as determined pursuant to Mississippi Code of 1972, Section 23–5–203, shall be declared the winner of the election and the commissioners of election shall give a certificate of election to the person so elected and shall return a copy of this order and a copy of the election returns certified by the Chancery Clerk of Madison County, Mississippi, to the Secretary of State of Mississippi and the Board of Supervisors of Madison County.

The persons so elected shall be commissioned by the Governor of the State of Mississippi and shall take office on February 6, 1984, upon taking the oath of office and entering into the proper official bond.

6. The present supervisors shall continue to hold office until the new supervisors elected hereunder take office.

7. Within ten (10) days following the date of this order, the election commission shall commence the publication, in a newspaper of general circulation in Madison County, of notice of the special elections ordered hereby and of the newly drawn district boundaries, which publication shall continue at least once each week for three consecutive weeks. If the election commission shall determine that maps would more effectively communicate the boundary lines to the public, maps may be substituted for or used to supplement the descriptions contained in appendix no. 7. This same notice shall also be posted during period of newspaper publication on the public bulletin board maintained at the Madison County Courthouse.

8. The term of office of the supervisors elected under the terms of this Order shall extend until their successors are duly elected under Mississippi law. This is an interim procedure for this special election only. Subsequent regular elections in these or other lawfully redrawn districts will be conducted in accordance with Mississippi law.

9. The parties are hereby directed to confer in good faith in an effort to reach a settlement as to the attorneys' fees and costs claimed in this action. In the event that the parties are unable to reach a settlement, any party seeking an award of attorney's fees and costs shall file a motion and serve notice of a hearing thereon not later than sixty (60) days from the date of this Order.

10. There remains undecided in C.A. No. J83–0381(B) the issue of whether a re-registration of the voters of Madison County should be held. That case will be set for hearing on that issue at a later date in accordance with the practices of this Court in setting non-priority cases on its docket.

11. The Court reserved the power to issue supplemental orders should the need arise to carry out the provisions of this Order.

APPENDIX NO. 1
POPULATION TRENDS BY SUPERVISOR DISTRICTS
MADISON COUNTY, MISSISSIPPI

| District 1 | 1960 | | 1970 | | 1980 | | 1960–1980 Change | 1970–1980 Change |
|---|---|---|---|---|---|---|---|---|
| Total | 16,416 | 100.0% | 14,684 | 100.0% | 16,963 | 100.0% | 547 | 2,279 |
| Black | 11,212 | 68.3 | 9,054 | 61.7 | 12,204 | 71.9 | 992 | 3,150 |
| White and All Other Non-Black | 5,204 | 31.7 | 5,630 | 38.3 | 4,759 | 28.1 | (445) | (871) |
| **District 2** | | | | | | | | |
| Total | 3,672 | 100.0 | 3,393 | 100.0 | 3,823 | 100.0 | 151 | 430 |
| Black | 2,481 | 67.6 | 1,935 | 57.0 | 2,146 | 56.1 | (335) | 211 |
| White and All Other Non-Black | 1,191 | 32.4 | 1,458 | 43.0 | 1,677 | 43.9 | 486 | 219 |
| **District 3** | | | | | | | | |
| Total | 6,359 | 100.0 | 6,491 | 100.0 | 14,914 | 100.0 | 8,555 | 8,423 |
| Black | 4,416 | 69.4 | 3,262 | 50.3 | 4,051 | 27.2 | (365) | 789 |
| White and All Other Non-Black | 1,943 | 30.6 | 3,229 | 49.7 | 10,863 | 72.8 | 8,920 | 7,634 |
| **District 4** | | | | | | | | |
| Total | 3,190 | 100.0 | 2,780 | 100.0 | 3,744 | 100.0 | 554 | 964 |
| Black | 2,704 | 84.8 | 2,299 | 82.7 | 3,054 | 81.5 | 350 | 755 |
| White and All Other Non-Black | 486 | 15.2 | 481 | 17.3 | 690 | 18.5 | 204 | 209 |

| District 5 | 1960 | | 1970 | | 1980 | | 1960–1980 Change | 1970–1980 Change |
|---|---|---|---|---|---|---|---|---|
| Total | 3,267 | 100.0 | 2,389 | 100.0 | 2,169 | 100.0 | (1,098) | (220) |
| Black | 2,817 | 86.2 | 1,998 | 83.6 | 1,800 | 83.0 | (1,017) | (198) |
| White and All Other Non-Black | 450 | 13.8 | 391 | 16.4 | 369 | 17.0 | (81) | (22) |
| | | | | | | | | |
| **Madison County** | | | | | | | | |
| Total | 32,904 | 100.0 | 29,737 | 100.0 | 41,613 | 100.0 | 8,709 | 11,876 |
| Black | 23,630 | 71.8 | 18,548 | 62.4 | 23,255 | 55.9 | (375) | 4,707 |
| White and All Other Non-Black | 9,274 | 28.2 | 11,189 | 37.6 | 18,358 | 44.1 | 9,084 | 7,169 |

## APPENDIX NO. 7
## DISTRICT # 1

Beginning at that point on the Madison/Leake County line in Section 1, Township 10 North, Range 5 East where the north right-of-way line of Revive Road intersects said county line, this point being the point of beginning for District # 1; run south along the Madison/Leake County line to the Pearl River in Section B, Township 9 North, Range 5 East; then run south westerly along the Madison/Scott County line to its intersection with the Hinds County line in Section 35, Township 7 North, Range 2 East; then run westerly along the Madison/Hinds County line to the intersection with the western boundary of the Brashear Creek Diversion Canal in Section 34, Township 7 North, Range 2 East; then run north along the western boundary of the Brashear Creek Diversion Canal to its intersection with the north right-of-way line of Rice Road in Section 28, Township 7 North, Range 2 East; then run easterly along the north right-of-way line of Rice Road to the north right-of-way line of the Natchez Trace Parkway in Section 27, Township 7 North, Range 2 East; then run northeasterly along the north right-of-way line of the Natchez Trace Parkway to its intersection with the east right-of-way of Old Canton Road in Section 14, Township 7 North, Range 2 East; then run north along the east right-of-way line of Old Canton Road to its intersection with the east right-of-way line of U.S. Highway 51 in Section 36, Township 9 North, Range 2 East; then run northeasterly along the east right-of-way line of U.S. Highway 51 to its intersection with the centerline of Bear Creek in Section 25, Township 9 North, Range 2 East; then run northwesterly along the centerline of Bear Creek to its intersection with the centerline of the Illinois Central Gulf Railroad tracks in Section 25, Township 9 North, Range 2 East; then run northerly along the centerline of the Illinois Central Gulf Railroad tracks to its intersection with the north right-of-way line of Peace Street in Section 24, Township 9 North, Range 2 East; then run easterly along the north right-of-way line by Peace Street and Mississippi Highway 16 to its intersection with the west right-of-way line of a county road near the center of Section 8, Township 9 North, Range 4 East; then run north along the west right-of-way line of said county road extended to its intersection with the north right-of-way line of Old Highway 16 in Section 5, Township 9 North, Range 4 East; then run east along the north right-of-way line of Old Highway 16 to its intersection with the east right-of-way line of Miggins Road extended in Section 36, Township 10 North, Range 4 East; then run south along the east right-of-way line of Miggins Road to its intersection with the north right-of-way line of Mississippi Highway 16 in Section 1, Township 9

North, Range 4 East; then run northeasterly along the north right-of-way line of Mississippi Highway 16 to its intersection with the west right-of-way line of Sulphur Springs Road in Section 31, Township 9 North, Range 5 East; then run north along the west right-of-way line of Sulphur Springs Road to its intersection with Revive Road in Section 19, Township 10 North, Range 5 East; then run northeasterly along the north right-of-way line of Revive Road to the point of beginning.

## DISTRICT # 2

Beginning at that point in Section 24, Township 9 North, Range 2 East where the north right-of-way line of Peace Street intersects the centerline of the Illinois Central Gulf Railroad tracks, this being the point of beginning for District # 2; then run southerly along the centerline of the Illinois Central Gulf Railroad tracks to the point where it intersects the centerline of Bear Creek in Section 25, Township 9 North, Range 2 East; then run southeasterly along the centerline of Bear Creek to its intersection with the east right-of-way line of U.S. Highway 51 in Section 25, Township 9 North, Range 2 East; then run southwesterly along the east right-of-way line of U.S. Highway 51 to its intersection with the east right-of-way line of Old Canton Road in Section 36, Township 9 North, Range 2 East; then run southerly along the east right-of-way line of Old Canton Road to its intersection with the north right-of-way line of the Natchez Trace Parkway in Section 14, Township 7 North, Range 2 East; then run southwesterly along the north right-of-way line of the Natchez Trace Parkway to its intersection with the north right-of-way of Rice Road in Section 27, Township 7 North, Range 2 East; then run westerly along the north right-of-way line of Rice Road to its intersection with the western boundary of the Brashear Creek Diversion Canal in Section 28, Township 7 North, Range 2 East; then run south along the western boundary of the Brashear Creek Diversion Canal to its intersection with the Madison/Hinds County line in Section 34, Township 7 North, Range 2 East; then run west along the Madison/Hinds County line to its intersection with the west right-of-way line of Old Canton Road extended in Section 32, Township 7 North, Range 2 East; then run north along the west right-of-way of Old Canton Road in its intersection with the present corporate limit line of the town of Madison in Section 20, Township 7 North, Range 2 East; then follow the present corporate limit line of the town of Madison to the west and north to the point where it intersects with the west right-of-way of Interstate 55 in Section 6, Township 7 North, Range 2 East; then run northerly along the west right-of-way line of Interstate Highway 55 to its intersection with the north right-of-way line of Mississippi Highway 22 in Section 23, Township 9 North, Range 2 East; then run easterly along the north right-of-way line of Mississippi Highway 22 and Peace Street to the point of beginning.

## DISTRICT # 3

Beginning at that point where the north right-of-way line of Mississippi Highway 22 intersects the west right-of-way line of Interstate Highway 55 in Section 23, Township 9 North, Range 2 East, this point being the point of beginning for District # 3; run southerly along the west right-of-way of Interstate Highway 55 to the point where it intersects the corporate limit line of the town of Madison in Section 6, Township 7 North, Range 2 East; then follow the corporate limit line of the town of Madison to the south and east to the point where it intersects the west right-of-way line of Old Canton Road in Section 20, Township 7 North, Range 2 East; then run south along the west right-of-way of Old Canton Road to its intersection with the Madison/Hinds County line in Section 32, township 7 North, Range 2 East; then run westerly along the Madison/Hinds County line west and north and west to its intersection with the west right-of-way line of the Flora/Pocahontas Road in Section 34, Township 8 North, Range 1 West, then run northerly along the west right-of-way line

of the Flora/Pocahontas Road to its intersection with the north right-of-way line of Mt. Leopard Road extended in Section 22, Township 8 North, Range 1 West; then run easterly along the north right of way line of Mt. Leopard Road to its intersection with the west right-of-way line of Cedar Hill Road in Section 18, Township 8 North, Range 1 East; then run north along the west right-of-way line of Cedar Hill Road extended to its intersection with the north right-of-way line of Mississippi Highway 22 in Section 7, Township 8 North, Range 1 East; then run northeasterly along the north right-of-way line of Mississippi Highway 22 to the point of beginning.

### DISTRICT # 4

Beginning at that point where the west right-of-way line of Mississippi Highway 16 intersects the Madison/Yazoo County line in Section 16, Township 10 North, Range 2 East, this point being the point of beginning for District # 4; run south along the west right-of-way line of Mississippi Highway 16 to its intersection with the west right-of-way line of Old Yazoo City Road in Section 21, Township 10 North, Range 2 East; then run south along the west right-of-way line of Old Yazoo City Road its intersection with the south right-of-way line of Heindl Road in Section 9, Township 9 North, Range 2 East; then run east along the south right-of-way line of Heindl Road extended to its intersection with the east right-of-way line of King Ranch Road in Section 13, Township 9 North, Range 2 East; then run north along the east right-of-way line of King Ranch Road extended to its intersection with the north right-of-way of Green Acres Drive in Section 12, Township 9 North, Range 2 East; then run east along the north right-of-way line of Green Acres Drive to its intersection with the centerline of the Illinois Central Gulf Railroad tracks in Section 7, Township 9 North, Range 3 East; then run southerly along the centerline of the Illinois Central Gulf Railroad tracks to its intersection with the north right-of-way line of Peace Street in Section 24, Township 9 North, Range 2 East; then run westerly along the north right-of-way line of Peace Street and Mississippi Highway 22 to its intersection with the west right-of-way line of Cedar Hill Road extended in Section 7, Township 8 North, Range 1 East; then run southerly along the west right-of-way line of Cedar Hill Road to its intersection with the north right-of-way line of Mt. Leopard Road in Section 18, Township 8 North, Range 1 East; then run southwesterly along the north right-of-way line of Mt. Leopard Road extended to its intersection with the west right-of-way line of the Flora/Pocahontas Road in Section 22, Township 9 North, Range 1 West; then run southerly along the west right-of-way line of the Flora/Pocahontas Road to its intersection with the Madison/Hinds County line in Section 34, Township 9 North, Range 1 West; then follow the Madison/Hinds County line and the Madison/Yazoo County line to the point of beginning.

### DISTRICT # 5

Beginning at that point on the Madison/Leake County line in Section 1, Township 10 North, Range 5 East, where the north right-of-way line of Revive Road intersects said county line, this point being the point of beginning for District # 5; run southwesterly along the north right-of-way line of Revive Road to its intersection with the west right-of-way line of Sulphur Springs Road in Section 19, Township 10 North, Range 5 East, then run southerly along the west right-of-way of Sulphur Springs Road to its intersection with the north right-of-way of line of Mississippi Highway 16 in Section 31, Township 9 North, Range 5 East; then run southwest along the north right-of-way line of Mississippi Highway 16 to its intersection with the east right-of-way line of Miggins Road in Section 1, Township 9 North, Range 4 East; then run north along the east right-of-way line of Miggins Road extended to its intersection with the north right-of-way line of Old Highway 16 in Section 36, Township 10 North, Range 4 East; then run west along the north right-of-way line of

Old Highway 16 to its intersection with the west right-of-way line of a southbound county road extended near the center of Section 5, Township 9 North, Range 4 East; then run south along the west right-of-way line of said county road to its intersection with the north right-of-way line of Mississippi Highway 16 in Section 8, Township 9 North, Range 4 East; then run westerly along the north right-of-way line of Mississippi Highway 16 and Peace Street to its intersection with the centerline of the Illinois Central Gulf Railroad tracks in Section 24, Township 9 North, Range 2 East; then run northerly along the centerline of the Illinois Central Gulf Railroad tracks to its intersection with the north right-of-way line of Green Acres Drive in Section 7, Township 9 North, Range 3 East; then run west along the north right-of-way line of Green Acres Drive to its intersection with the east right-of-way line of King Ranch Road extended in Section 12, Township 9 North, Range 2 East; then run south along the east right-of-way line of King Ranch Road to its intersection with the south right-of-way line of Heindl Road extended in Section 13, Township 9 North, Range 2 East; then run westerly along the south right-of-way line of Heindl Road to its intersection with the west right-of-way line of Old Yazoo City Road in Section 9, Township 9 North, Range 2 East; then run north along the west right-of-way line of Old Yazoo City Road to its intersection with the west right-of-way line of Mississippi Highway 16 in Section 21, Township 10 North, Range 2 East; then run north along the west right-of-way line of Mississippi Highway 16 to its intersection with the Madison/Yazoo County line in Section 16, Township 10 North, Range 2 East; then follow the Madison/Yazoo County line, the Madison/Attala County line and the Madison/Leake County line to the point of beginning.

# MAP 1
# EXISTING SUPERVISOR DISTRICT BOUNDARIES
## AUGUST, 1983

LEGEND

SEE SEPARATE LEGEND FOR
CENSUS BOUNDARY SYMBOLS
TYPE STYLES,
AND GEOGRAPHIC AREAS

1980 State/County codes
28 · 089

1980 Census District Office Number
3031

1980 Census Map Inventory Number
28 · 089 · 001

4 MILES

4000 0 4000 8000 12000 16000 20000 24000 28000 FEET

4 KILOMETERS

District 1 (005)

304

District 1 (015) Part

2

District 2 (010)

FLORA

303

3

SEE JACKSON MS
METROPOLITAN MAP SERIES

ADDITIONAL AREAS MAY BE DESIGNATED
URBANIZED AND SOME CENSUS DESIGNATED
PLACES MAY BE DELETED BASED ON ANALYSIS
OF THE AL 1980 CENSUS DATA.

GENERAL HIGHWAY MAP
# MADISON COUNTY
## MISSISSIPPI
PREPARED BY
MISSISSIPPI STATE HIGHWAY DEPARTMENT
TRAFFIC AND PLANNING DIVISION
IN COOPERATION WITH THE
U S DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
BUREAU OF PUBLIC ROADS
DATA OBTAINED FROM
TRAFFIC AND PLANNING SURVEY
AND
AERIAL PHOTOGRAPHS

TRANSVERSE MERCATOR PROJECTION

JOSEPH A. LUSTECK & ASSOCIATES, INC
REAL ESTATE / PLANNING CONSULTANTS
800 NORTH PRESIDENT ST
JACKSON, MISSISSIPPI

REPRODUCTION OR ALTERATION IN WHOLE OR
IN PART WITHOUT WRITTEN PERMISSION OF THE
MISSISSIPPI HIGHWAY COMMISSION IS PROHIBITED

LEGEND

COUNTY ROAD NAMES MAP
# MADISON COUNTY
MISSISSIPPI

MISSISSIPPI STATE HIGHWAY DEPARTMENT
TRAFFIC AND PLANNING DIVISION

U S DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION

COUNTY ROAD NAMES 1979 BY

**CMPDD**

CENTRAL MISSISSIPPI
PLANNING AND DEVELOPMENT DISTRICT

TRAN VERSE MERCATOR PROJECTION

BOARD OF SUPERVISORS

Pat H Luckett
A E Crawford
J S Harris
E C Mansell
Amos Dowdle

CANTON

MISSISSIPPI

MADISON COUNTY

MISSISSIPPI STATE HIGHWAY DEPARTMENT
TRANSPORTATION PLANNING DIVISION

U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION

SCALE IN FEET

SCALE IN METERS

# MAP 2
# PROPOSED
# SUPERVISORS
# REDISTRICTING
# PLAN
## AUGUST, 1983

GENERAL HIGHWAY MAP
# MADISON COUNTY
## MISSISSIPPI
PREPARED BY
MISSISSIPPI STATE HIGHWAY DEPARTMENT
TRAFFIC AND PLANNING DIVISION
IN COOPERATION WITH THE
U S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
BUREAU OF PUBLIC ROADS
DATA OBTAINED FROM
TRAFFIC AND PLANNING SURVEY
AND
AERIAL PHOTOGRAPHS

TRANSVERSE MERCATOR PROJECTION

JOSEPH A. LUSTECK & ASSOCIATES, INC.
REAL ESTATE/PLANNING CONSULTANTS
600 NORTH PRESIDENT ST
JACKSON, MISSISSIPPI

CANTON
AND VICINITY

District
5
(025)

District
4
(020)

302
PART

REPRODUCTION OR ALTERATION IN WHOLE OR IN PART WITHOUT WRITTEN PERMISSION OF THE MISSISSIPPI HIGHWAY COMMISSION IS PROHIBITED